IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WALTER SMITH,

        Plaintiff,

  v.

BETH LIND, et al.,

        Defendants.

OPINION AND ORDER

14-cv-796-slc

18-cv-189-slc

Plaintiff Walter Smith has two lawsuits pending before this court.  In Case No. 14-cv-796-slc (Case '796), Smith is pursuing claims that Waupun Correctional Institution (Waupun) provided inadequate Ramadan meal bags from 2008- 2011, among other dietary claims.  Smith is represented by volunteer counsel in this case.  In Case No. 18-cv-189-slc (Case '189), Smith is claims that Waupun's drinking was contaminated between 2009 and 2012.

Defendants claim that Smith has fabricated material evidence in both cases and they have moved for the sanction of dismissal. (*See* dkt. 163 in Case '796; dkt. 67 in Case '189.)   As set forth below, I find that Smith fabricated evidence in support of Case '189, and that he repeatedly lied to both the court and to defense counsel about the production of that fabricated food log.  Dismissal of both lawsuits with prejudice is the appropriate sanction. Any lesser sanction would be an inadequate response to Smith's fabrication and lies in these lawsuits. Accordingly, I am granting defendants' motions to dismiss, entering judgment in defendants' favor and closing both of these cases.

## Procedural Background Relevant to Dismissal

Defendants claim that Smith fabricated a food log, the alleged existence of which he fronted at his May 2019 deposition in Case '796, followed by Smith's repeated delays and prevarications during the course of discovery when defendants asked Smith actually to produce

this log.  Defendants first brought this motion in Case '796 case in November of 2019;  I denied that motion as premature because Smith had not submitted the food log as evidence in either lawsuit.  Defendants renewed this motion when Smith submitted the food log as evidence in opposition to defendants' motion for summary judgment in Case '189 case.   (Case '189, dkt. 67; Case '796, dkt. 163.)  I scheduled an in-person evidentiary hearing on this dispute, but then the COVID pandemic hit.  For health and safety reasons,  I held the hearing by Zoom, starting on November 18, 2020, and concluding on December 10, 2020, followed by some post-hearing briefing.    The evidence submitted by the parties has been extensive and their arguments thorough.[1]

## Applicable Law

"A district court has inherent power to sanction a party who 'had willfully abused the judicial process or otherwise conducted litigation in bad faith.'" *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) (quoting *Salmeron v. Enterprise Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009)). Here, the defendants have the burden to prove the factual basis for seeking sanctions to a preponderance of the evidence. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 778-81 (7th Cir. 2016),  I begin with the court's findings of fact followed by an analysis why dismissal with prejudice is the appropriate sanction.

---

[1]  Defendants submitted a post-hearing brief and motion to admit evidence.  Smith's attorneys in Case '796 filed a brief on behalf of Smith.  Smith did not file a post-hearing brief in Case '189.  Because the issues are the same in both cases, because Smith has received outstanding representation in Case '796, and because Smith has not sought leave to submit an untimely post-hearing brief in Case '189, I conclude that the the court has received sufficient input to rule fairly on both dismissal motions.

## I.  Findings of Fact

### A. Motion to admit evidence (dkt. 114)

In response to my direction during the hearing, defendants filed a motion to admit four categories of evidence that were addressed but not admitted during the hearing: (1) a March 22, 2012, Property Receipt/Disposition; (2) defendants' Exhibits 509, 515, 516, 517, four phone call recordings that took place on August 13, 2018; May 22, 2019; June 8, 2019; and June 21, 2019; (3) defendants' Exhibit 510, witness Rashida Roger's deposition transcript; and (4) an original copy of Walter Smith's food log.

Smith only objects to the admission of the March 22, 2012, Property Receipt/ Disposition, which defendants submitted to impeach Smith's testimony that a notepad he used to record food log entries had been confiscated and destroyed by staff at Stanley Correctional Institution (SCI), when Smith was transferred there in 2012.  First, Smith  points out that defense counsel did not produce this document prior to Day 2 of the evidentiary hearing, despite the fact that the two hearings were three weeks apart.  Even so, I do not see this as a basis to exclude it, given that I did not allow defense counsel to question Smith about the property receipt, and Smith and his counsel have since reviewed it.

Smith also points out that this evidence is beyond the scope of defendants' fabrication argument (which defense counsel concedes), faulting defendants for failing to depose Smith a second time prior to the first day of the hearing.  This argument is unpersuasive.  Defendants have been pushing their evidence fabrication claim since August of 2019, and Smith responded

substantively to this claim.  Yet Smith never even mentioned his use of notepads until the first day of testimony at the evidentiary hearing.  (*See* Case '796, dkts. 152, 208.)[2]

Smith's failure to alert anyone to his alleged use of notepads at any prior time raises bright red flags because Smith's late-offered notepad explanation is directly responsive to defendants' belief that Smith's incorrect dates in the actual food logs were evidence that he fabricated them.  I will not fault defense counsel for failing to depose Smith again prior to the evidentiary hearing or for having failed to ask Smith directly "Did you have a separate food log apart from the food log you produced?"

Smith also argues that the March 22, 2012 Property Receipt has not been properly authenticated because the accompanying declaration does not meet the "business records exception" for hearsay.  Authentication is a threshold evidentiary requirement, *see* Fed. R. Evid. 901(a), and defendants adequately authenticated that document through the declaration of Claire Hickey-Wilbur.  (*See* Hickey-Wilbur Decl., dkt. 216.)

That said, Smith is correct that Hickey-Wilbur's statements in her declaration do not meet the requirements for the hearsay exception, *see* Fed. R. Evid. 803(6).  Defendants concede the point but they did not offer this evidence to prove that Smith's property items were actually thrown away, but rather to impeach Smith's testimony that officers arbitrarily threw away his property.  This is a fine line to draw; it's also inconsistent with defendants' reliance on the content of this document as proof that SCI did not destroy the notepad.  (Def. Br., dkt. 113, at 10-12.)  Ultimately, the reason *why* Smith no longer possesses the notepad in question is  not particularly probative of whether Smith fabricated the food log.  Therefore, I am granting in part

---

[2]  For ease of reference, all citations hence will be to Case '796 unless otherwise noted..

and denying in part defendants' motion to admit evidence: I am excluding Smith's speculative testimony that the notepads were destroyed, and I am excluding the March 22, 2012, Property Receipt/Disposition. I am admitting defendants' other proposed exhibits.

### B.    Smith Fabricated the Food Log

I have considered all of the properly admitted exhibits,  I have considered the testimony and demeanor of all the witnesses, and I have made credibility determinations based on that testimony in conjunction with the other admitted.  I find by a preponderance of the evidence that Smith fabricated the food log about which he testified at his May 2019 deposition.  I find by a preponderance of the evidence that Smith was intentionally dishonest in his communications with the court and defense counsel about his delays in producing that food log. Here is how I arrived at this finding:

### 1.  Date Discrepancies

In 2010, Ramadan started on August 11 and ended on September 9, 2010.  In Smith's logs he wrote that he received Ramadan meal bags between August 2 and September 3.  (Def. Ex. 502.)  The evidence related to this date disparity shows that the food log was fabricated, and Smith's various–and varying--explanations for the disparities are incredible.

As defendants' point out, during the summer of 2019, Smith would have had access to the transcript of his May 2019, deposition transcript, which contained the dates of Ramadan in every relevant year *except* for 2010. (11/18/20 Tr., dkt. 208, at 105-06.) In addition, I have previously noted that while Smith's Ramadan tracking was nine days off, other entries in Smith's

August 2010 food log *were* accurate. The accurate entries were for non-Ramadan events that Smith could verify at the time he actually composed the log by reviewing his inmate complaints and medical records from those dates.  In my November 5, 2019 order, I noted that despite Smith's incorrect dates for the Ramadan days, the food log contained accurate entries on August 22, August 26, and August 31, related to Smith's filing of an inmate complaint, submitting a Health Service Request (HSR), and meeting with a nurse.  (11/5/19 Order, dkt. 160, at 5-6.)

Smith's explanations for these inconsistencies are incredible, in large part because he keeps changing his story based on which way the wind is blowing.

First example: in opposition to defendants' initial motion to dismiss, Smith attested in no uncertain terms that he kept his "food logs contemporaneously over the course of many years." (Smith Decl., dkt. 152, ¶ 1.)  At that time, Smith acknowledged his incorrect dates, but explained that he made the mistake in June 2010 when he was crafting a complaint about Ramadan to the warden, attesting that the "incorrect start dates is the same date I used in the food logs." (*Id.* ¶ 3.) Smith further stated that he discovered his error *after* Ramadan in October 2010, made a note to correct his food log, but failed to correct it.  (*Id.* ¶ 3.)

However, when Smith opposed defendants' motion at that point, he did not explain how, under this scenario, the non-Ramadan entries above could be correct while the Ramadan-related entries were consistently nine days off.  Although Smith suggests that he lost track of the actual dates, Smith failed to explain how he did not realize that the dates in his food log were wrong between August 2 and August 10, when he believed Ramadan was taking place, but he had not been receiving Ramadan meal bags.

6

During the evidentiary hearing, Smith provided a brand new, inconsistent explanation of how he got the dates wrong. First, he testified that in 2010, he did not have a lunar calendar that would have provided him the Ramadan dates, so he had to estimate the start date by subtracting nine days from the 2009 Ramadan dates. (12/10/20 Tr., dkt. 213, at 2, 7.) Although Ramadan started on August 22, in 2009, Smith believes that he subtracted ten days twice:

> I believe what happened was when I wrote down the initial 2009 date, I had subtracted the ten days to August 12th. And then when I went to write down the 2010, I subtracted the same ten days again and ended up with August 2nd.

(*Id.* at 10.)

That testimony did not necessarily raise a red flag. But Smith went further, walking back the connection between his mistake and the June 2010 letter, testifying that it would not have made sense for him to use this letter as a way to fabricate the food log because the dates in the letter were not actually the dates in his log. (12/10/20 Tr., dkt. 213, at 11-13.) Instead, he testified that the 2010 Ramadan entries – and *not* his later, correct, entries related to an inmate complaint and medical-related matters – were incorrect because he was keeping a *separate* notebook during that period of time, in which he recorded his Ramadan-related symptoms. Smith elaborated that this was consistent with his practice of *first* transcribing his food log entries about his Ramadan meals in a handheld notepad, using the days of Ramadan (Ramadan Day 1), not Western calendar dates, and then copying them later, sometimes weeks later, into his food log. (11/18/20 Tr., dkt. 208, at 78.) Smith testified that when Ramadan was over, he reverted to recording events in his food log based on the Western calendar.

Smith says that he maintained this practice because he was often bedridden from his symptoms and fatigue towards the end of Ramadan, and it was easier to write in the notepad rather than in his food log. Specifically, Smith testified that at the beginning of Ramadan, he would "be recording as things [were] going along," sometimes immediately, because the effects of his fast and the food were not "that significant." (*Id.* at 63, 71-72.)[3]

Smith's explanation is incredible; it borders on absurd. Two examples illustrate the falsity of Smith's new account. First, in Smith's August 31, 2010, food log entry, he wrote that he "saw [a] nurse about intestinal cramps, all over," and that she said that he should not be given meal bags. (Ex. 502, at 64.) When asked about this entry, Smith testified that he would have written about this interaction first in his notepad, likely labeled "Ramadan Day 30," and then later transcribed it in his food log for his August 31, 2010, entry. (11/18/20 Tr., dkt. 208, at 102-103.) When defendants' attorney pointed out that Smith's notepad for Ramadan had been off by nine days, Smith found himself in free fall with a broken ripcord. Clearly confabulating on the fly, Smith explained that his August 31 entry was drawn from other "notes that [he] kept again with the other information dealing with specific dates," which he would have recorded in the food log later, using the correct date. (*Id.* at 103-04.). This never happened. If Smith had created a free-standing note detailing an August 31 interaction, and then *separately* had written in his notepad about that same interaction, labeling it "Ramadan Day 30," then Smith would

---

[3] This is the point at which Smith testified his notebook was destroyed by the prison when he was transferred from Waupun to SCI because he had too many notepads. (11/18/20 Tr., dkt. 208, 64, 67.) However, Smith testified that he had a *third* notepad, which had not been destroyed, which contained his notes from October 2010, referenced above. (*Id.* at 66, 152.) Although defendants submitted evidence and argument related to this alleged destruction of property, as explained above, I have excluded it from consideration.

necessarily have realized that his dates were off, given that as of August 31, he would have received only 20 days of Ramadan meals.  Smith is a creative thinker; perhaps by now he has come up with a new explanation for the palpable discrepancies in his testimony, but the court has heard and seen enough to be confident in its conclusion.

Second example: Smith's testimony about the September 9, 2010, entry in his food log cannot be squared with reality.  Here is the entry:

> Saw Tuckwell, I ask him how could he allow me to go through an entire Fast without changing my diet, I told him I wrote him begging him to consider my condition.  He stated he got my letter and I'm wasting my time, no one believes you and even if I'm suffering the sign on the front of prison say[s] Waupun Correctional, this is prison.

> (Def. Ex. 502, at 65.)

Smith testified at the evidentiary hearing that he would have written this entry into his notebook first and into his food log second, "still following that same mechanism of when it occurred." (11/18/20 Tr., dkt. 208, at 93.)  But, using Smith's incorrect dates, Ramadan would have been over by September 9, meaning that Smith would have been using Western calendar days.  Yet, as defendants point out, Smith's explanation that he switched back to Western calendar days after Ramadan does not hold together because September 9, 2010 was the *actual* last day of Ramadan, *and* Smith further testified that his conversation with Tuckman would have taken place on the *real* September 9, 2010, since he had dated that conversation in his notepad as taking place on September 9, 2010.  (*Id.* at 96.).  So taking Smith's testimony as true, then his notepad entries from 2010 would have been listed as follows: "Ramadan Day 29, Ramadan Day 30, September 10, September 11 . . ."  This ordering would have made it obvious to Smith

that his dates were off, but Smith testified that he did not notice any problem because he filled in the dates later, and it seemed to him that the dates matched up. (*Id.* at 94.)

Smith tries to explain this away by pointing to his claimed practice of keeping multiple notepads and recording food log entries days or weeks later, prioritizing symptoms from the Ramadan bags over non-Ramadan entries such as medical appointments. (11/18/20 Tr., dkt. 208, at 69.) Smith further points to his testimony that sometimes there were several-week delays between when he wrote his symptoms in his notepad and when he recorded them in his food log, and his practice was the same with respect to his recording non-Ramadan events involving his medical care. Given that Smith testified that he counted Ramadan as "day one, day two, etc.," but he had a record of the actual dates of the non-Ramadan events, Smith contends that it was possible for him to record the non-Ramadan events accurately but his food-related symptoms inaccurately.

This explanation is not borne out by Smith's entries in the food log. Looking at just the September 9, 2010, page of the food log, on September 2 and 4, Smith's entries listed non-Ramadan-related issues above his food-related symptoms. (Def. Ex. 502, at 65.) Furthermore, Smith's explanation does not make sense with respect to the Tuckwell conversation. Everyone agrees that this conversation would have taken place on "Ramadan Day 30," September 9, *and* that Smith wrote in his notepad that the day was September 9. Even assuming Smith did not transcribe this notepad entry into the food log until the end of September, Smith never explains how, on the actual September 9, when he wrote this in the notepad initially, it would have been possible for him to not realize that it was both September 9 and the last day of Ramadan.

10

Aside from these discrepancies, defendants ask that I entirely reject Smith's testimony about his use of a notepad. They point out that Smith has not explained why he failed to alert the court or defendants to his notepad/notetaking process and use of the lunar calendar until the hearing, despite the fact that defendants raised the date disparity issue in August of 2019.

Smith responds that he was under no obligation to disclose the fact that he was using a notepad as a way to record the information that eventually ended up in the log book; defendants' evidence about the fabrication remain theoretical; and that defendants have unfairly pieced apart Smith's record-keeping process from years ago to support their fabrication claim without specifically drilling down on the details about how Smith did not notice the date disparity in his notepad or food log.

I agree with Smith to this degree: we cannot look at the evidence the way that Cameron Frye looked at Seurat's *Sunday Afternoon on the Grande Jatte.* As Ferris Bueller would tell us, that's not going to get you anywhere. But widening the focus does not help Smith. Having looked objectively and reasonably at the big picture–*all* of the dots, *in context*–I conclude that Smith fabricated his food log and he has been lying about it ever since. It's not just one thing that leads me to this conclusion, it's everything, taken together and viewed through the lenses of logic, common sense and experience.

For instance, Smith contends that because defendants did not ask the correct question directly and because defendants declined to depose Smith again prior to the hearing, the court should not be skeptical of Smith's failure to disclose earlier his use of notebooks. But logic and common sense compel skepticism. Smith essentially is claiming that he withheld extraordinarily relevant, helpful evidence because defendants didn't ask for it the right way. That doesn't make

11

any sense on any level.  The conclusion I have drawn from the totality of circumstances–including Smith's testimony at the evidentiary hearing–is that Smith didn't disclose the notebook earlier is because it didn't exist: there is no notebook and there never was.

Defendants fronted the date discrepancy issue almost 16 months before the evidentiary hearing and Smith attested, at that time, that he was creating the food log *contemporaneously* and he attributed his incorrect entries to a mistake he made in June 2010.  There was no mention of another notebook; if it actually had existed, then one would expect Smith to say so at that time.  Although plaintiff points out that the date Smith used in that June 2010 draft letter was incorrect (listing August 3 and not August 2 as the start date), that is not the critical piece of evidence.  What is crucial is that, in September of 2019, Smith *attested* "This incorrect start date is the same date I used in the food logs."  (Dkt. 152 ¶ 3.)  It was not incumbent upon defendants to probe further and divine that Smith's explanation was actually more nuanced or robust.  Moreover, Smith is adamant that he was not responsible for explaining himself prior to the hearing, but Smith still has not explained *why* he changed his explanation, much less his initial failure to notify the court that a cause for the date disparity was that he had been using a separate notepad and there were delays between when he wrote in the notepad and transcribed his notes into the food log.  Smith's 18-month silence on this critical point screams post hoc fabrication.

12

In sum, the evidence establishes that Smith fabricated the food log. I do not believe that he ever actually possessed the now-missing notepad, nor do I believe Smith's testimony trying to explain away the myriad inconsistencies in his testimony.[4]

### 2. Smith's Delayed Production of the Food Log

Defendants point to Smith's over two-month delay in producing the food log as evidence that Smith fabricated it for purposes of these lawsuits. Defendants further maintain that Smith lied in explaining his reason for the delay – by falsely representing that his cousin Rashida Rogers possessed it and was trying to send it to him – when in fact he was fabricating the food log during this time with the help of his friend, Natalie Johnson. Defendants contend that Smith's communications with his daughter in September and October 2019 demonstrate that he was lying about the food log. The parties have submitted evidence related to Smith's communications. Having considered all of the evidence, I find that Smith was not truthful with defendants, with his volunteer counsel, or with the court about his delays in producing the food log.

---

[4] For completeness's sake, I note that the parties addressed two other issues relevant to whether Smith fabricated the food log. First, the parties dispute the veracity of Smith's testimony about being bedridden, which compelled him to write in a separate notepad during Ramadan. To impeach Smith's testimony that he was often bedridden during Ramadan, defendants submitted evidence that Smith attended recreation periods during Ramadan. Smith testified that he often was required to attend recreation, but that he did not actually attend recreation on days when he was so sick that he could not rise out of bed to access his food log. (11/18/20 Tr., dkt. 208, at 80-81.) Smith further testified that sometimes his symptoms were not that bad in the morning, when recreation was held, and that sometimes moving around would help his symptoms. (*Id.*) Second, both sides piece apart Smith's testimony about the number of days he recorded for Ramadan in 2010. Defendants focus on the fact that Smith included multiple extra days in the 2010 Ramadan. However, Smith testified that he did not have enough room in his log for all of his entries related to the last few days of Ramadan. (11/18/20 Tr., dkt. 208, at 91.) I am skeptical of every explanation offered by Smith, including these, but they are fairly inconsequential relative to the issues that I have addressed in the body of this order, so I have relegated them to a footnote.

(a) **Natalie Johnson**

Defendants contend that Smith's  friend, Natalie Johnson, was helping Smith prepare his food log, and that Rogers never actually possessed it.  I find that defendants have proved this contention by a preponderance of the evidence.

The evidence of record establishes that Smith first called Johnson on May 22, 2019.  This was less than two weeks after his deposition in Case '796, and just two days after defendants had asked Smith to produce his log.  During this conversation, Smith told Johnson that he was sending her something to copy "involving" his lawsuit.  (Def. Ex. 505; dkt. 163, at 8-10.)  Smith told Johnson that he had had a "deposition a couple weeks ago," that his lawyer could not believe how well he performed, and that the "Attorney General" that deposed him agreed to reach out to his institution about certain Ramadan accommodations.  (11/18/20, dkt. 208, at 197.)  After that conversation, Smith sent Johnson pages of a blank log for her to copy.

Smith claims that he sent Johnson blank pages to create a log for a *different* lawsuit, related to the harassment he suffered at SCI.  Smith explains that he did not want to reference the harassment lawsuit specifically because his complaint had been destroyed by SCI officials, and he wanted to be careful.  (11/28/20 Tr., dkt. 208, at 198.)  Smith claims that he only mentioned the deposition in Case '796 because he credited her for his ability to create the food log, since she had been making copies of the blank template since as early as 2013.  (12/10/20 Tr., dkt. 213, at 30-31.)  However the timing of this phone call is suspicious, coming just days after defendants served him with a request for production of the food log.  At the very least, Johnson was assisting Smith with *something* related to this lawsuit, and given the timing of the phone call, I believe it was the food log.  Furthermore, I do not believe Smith's testimony about

his concern about discussing his harassment lawsuit. As defendants point out, during a subsequent call with Johnson, from June 21, 2019, Smith talked about how a prison official should know he could sue him for retaliation, noting that he had already sued 82 SCI officials in another lawsuit.  (11/28/20 Tr., dkt. 208, at 210; Def. Ex. 517, at 7:40-9:45.)

Smith's next conversation with Johnson, which took place on June 8, 2019, also touched on Case '796.  At this point, Johnson had copied the calendar but apparently the copy she had made put the months in the wrong order.  Johnson asked Smith whether he could send it back to her to fix it, and Smith responded:

> I just talked to my attorney.  I got another call on Monday. . . .
> I'm going to talk with him again.  Yeah, because they know I need
> time to put it because I got to copy it by hand, right? . . .  They
> know I need time to do that. . . .

(Ex. 136 ('189 case, dkt. 71-5; '796 case, dkt. 167-5) at 0:58-4:46.)  Again, defendants say that Smith was referencing this lawsuit, and Smith admits that he was referring to his attorney from Case '796.  (11/28/20 Tr., dkt. 208, 199-201.)  But Smith points to his testimony on the second day of our evidentiary hearing, when he explained that this phone call was about the 2017-2019 food log, which he testified was relevant to *both* Case '796 and the harassment lawsuit that he eventually filed in November 2019.  Smith says that he needed to make a copy of those entries for purposes of his harassment lawsuit, since he had to send the entire food log to his attorneys, and his 2017-2019 log contained information relevant to both lawsuits.  (*Id.* at 32-33.)

This explanation makes little sense when viewed in context.  Smith does not explain why *he* needed to make a hand-written copy of the 2017-2019 food log, when his attorneys easily could have photocopied the log for him and sent it back, and when Johnson could have just made the copies for him and sent them back.  Indeed, Smith testified that he had sent Johnson

15

other documents to copy during their May 22, 2019, phone call.  The most rational explanation for why Smith needed Johnson to re-send him the blank pages of the food log was because Smith was *creating* a log at the time.

Smith and Johnson talked a third time on June 21, 2019, and Johnson told him she had sent his copies to him the prior Tuesday.  Smith mentioned a phone call with his lawyers on Tuesday, June 25, commenting: "Because I want them just so the Attorney General who arguing for the defendants in my lawsuit, they say I'm looking at this stuff and I'm saying to myself, you know, this – you know that people going to stretch the truth." (Dkt. 201, at 11, p. 50; Def. Ex. 517.)  Smith admitted that he had a phone call with his attorneys for Case '796, and that he had told them he expected to receive the food log from his cousin any day, but it was delayed because the mail room rejected the package.  (11/28/10 Tr., dkt. 208, at 205.)  Given Smith's reference to an ongoing case in the context of the copies that Johnson had sent, I interpret Smith's statements to mean he was creating the food long to strengthen his claims in Case '796.

Each of these conversations may have touched on the harassment suit Smith was planning, but I conclude and find that Smith was working on creating the food log to produce to defendants in the Smith's '796 case because (1) Smith was referring to his lawyers in talking to Johnson about the case and his harassment complaint had not been filed yet at that time, and (2) Smith admitted that he was talking about defense counsel in his '796 case.

**(b)  Smith's Communication with his Daughter Jaquel**

Finally, defendants contend that Smith's testified falsely about his communications with his daughter Jaquel in September and October of 2019.  On September 30, 2019, Smith emailed Jaquel:

> Did you read that letter I sent you.  Did you peep what I was saying?  When I call you we can discuss it on the low.  I'm in the middle of responding to a motion now.  They tried to catch me slipping, but I'm self-gripin, anti-slip.  LOL.

> (12/10/20 Tr., dkt. 213, at 46.)

Defendants' contend that Smith is referring to defendants' motion for sanctions.  When confronted with this email during the evidentiary hearing, Smith testified that he wasn't sure, but he believed he was referring to his harassment lawsuit, of which Jaquel was aware.  (*Id.* at 47.)  Smith testified that he wanted to speak with her "on the low" about it because his first harassment complaint already had been destroyed, and that he wrote "They tried to catch me slipping" because prison officials thought he would not find out that they had thrown away his complaint.  (*Id.*)  This testimony fails to explain how Smith could be "responding to a motion now" *in a lawsuit that he had not even filed yet.*  Defense counsel did not follow up on this at the hearing.

Instead, defendants point to Smith's October 12, 2019, email to Jaquel, in which he wrote: "Oh, I had to give my attorney your address because the people I'm suing attorney wanted [Rogers'] phone number or address to contact her about my log, what I wrote you about. I told her she moved to Atlanta and I don't have her information. . . .  So expect them to contact you."  (12/10/20 Tr., dkt. 213, at 48.)  Smith acknowledged that he was talking about his food log in the '796 lawsuit, so defendants argue that this second email discredits Smith's testimony

17

about the September 30 email. Defendants further maintain that this emails shows that Jaquel was aware of the issues Smith was having with the food log over the summer, contradicting Smith's testimony that Jacquel was unaware of the food log issues until this October email.

Smith objects to this line of argument and evidence because defendants were improperly attempting to use this evidence for purposes beyond impeachment. This objection has traction, so I will not rely on this exchange when determining that Smith's September 30 email was about the food log. Nonetheless, Smith's testimony about his communications with Jaquel did not help his credibility.[5]

As of September 30, 2019, Smith had already responded to defendants' motion to dismiss in Case '796, so I do not believe Smith was referencing the motion to dismiss in that case. Rather, I conclude that Smith was referencing Case '189. On September 30, 2019, Smith filed a motion for extension of time to respond to defendants' motion for summary judgment in that case, which I granted, giving him until October 7, 2019. ('189 case, dkts. 36, 37.) Therefore, Smith was referring to his opposition deadline in the '189 lawsuit. Also, I find that Smith was untruthful when he explained that his statement "They tried to catch me slipping" referred to him catching prison officials throwing away his complaint. It does not make sense in this context for Smith to say that anyone was trying to catch him. Rather, this full statement, including his line "I'm self-grippin, anti-slip"– written shortly after Smith had turned over the food log and responded to defendants' motion to dismiss–makes much more sense as a comment

---

[5] To be clear, when determining the credibility of Smith's testimony on the various topics addressed in this order, I am not employing the discredited maxim *falsus in uno, falsus in omnibus*, *see United States v. Vance*, 764 F.3d 667, 673 (7th Cir. 2009), but Smith's obvious lies on some topics negatively impact his credibility on other topics where the falsity of his testimony is not as palpable. *See Pruitt v. McAdory*, 337 F.3d 921, 927 (7th Cir. 2003).

about how Case '796 had been going.  Therefore, considering this evidence for impeachment purposes only, it further diminishes Smith's general credibility.

### (c)  Rashida Rogers' Testimony

By way of background, during Smith's May 9, 2019, deposition, he testified that he kept a food log starting in 2008, but that Rashida Rogers had physical possession of the 2008-2011 portion of the log since April of 2012 after Smith was transferred to SCI.  (Smith Dep., Case '796, dkt. 91, at 109-10.)  Smith testified that in February of 2019, he had written to Rogers asking that she send the log to him, and a few months later when he had received nothing he unsuccessfully tried to call her about it, which was why he did not have that portion of the log at the time of his deposition.

Following Smith's deposition, on May 20, 2019, defendants served a discovery request on Smith requesting all of his food logs.  Smith did not produce the logs until August 15, 2019, and defendants subsequently asked Smith in an interrogatory to explain the steps he'd been taking to obtain his food log. He responded:

> After my [May 9] deposition, I contacted my cousin to have her send the 2008-2011 food portion of the food log to me.  However, when the mail room received the food log sent by my cousin, the mail room returned it to my cousin when I was in segregation, which was on June 11, 2019.  I did not become aware that the mail room returned the package to my cousin until she informed me the package had been returned over the phone.

> (Paulson Decl., Ex. 129, dkt. 167-1, at 6.)

Smith explains that he was able to reach Rogers by having another inmate call his girlfriend and conference Rogers into the call, at which point Rogers said that the log had been returned to her by the prison.

Defendants believe that Smith lied about (1) contacting Rogers, (2) the mail room confiscated the food log, and (3) who–if anyone–had the food log.  During the evidentiary hearing, defendants elicited testimony from Smith and from Rogers about these issues.  I find that Smith was not being truthful about his communications with Rogers, for the following reasons:

Smith's and Rogers' testimony often was inconsistent.  This, by itself does not necessarily prove that either one of them was not testifying truthfully.  But inconsistent stories do raise reasonable suspicions that things are not as they seem.  *Cf United States v. Walton*, 827 F.3d 682, 688 (7th Cir. 2016) (during traffic stop, presentation of conflicting stories by driver and passenger was relevant to officer's conclusion that they were lying).  For instance, Smith and Rogers gave widely divergent estimates of how frequently they communicated.  Rogers testified that she did not have a close relationship with Smith, that Smith had written to her possibly five times over the past 20 years, and she had spoken to him *maybe* twice on the phone (11/18/20 Tr., dkt. 208, 166).  Smith, on the other hand, testified that he spoke to Rogers every two to three months from 2007 to 2012 (*id.* at 125). This type of discrepancy over what should be easily-recalled informs their credibility.

Additionally, Rogers and Smith provide different stories about the three-way phone call that Smith referenced in his interrogatory response.  Smith claimed that he was able to speak with Rogers through another inmate's girlfriend, who was able to conference Rogers into their

20

Case: 3:14-cv-00796-slc   Document #: 222   Filed: 04/20/21   Page 21 of 25

phone call.[6]  However, Rogers did not recall speaking to Smith at all; she remembers receiving a phone call from a female who asked her if she sent the logs, and Rogers responded "yes." (11/18/20 Tr., dkt. 208, at 175.)  Rogers was unable to testify with confidence about whether, at the time the woman called her, she had already received the log back.  When questioned by defense counsel, Rogers agreed that it may have been possible that she spoke with the woman after she already had  sent the log back to SCI (*id.* at 176), but when plaintiff's counsel asked whether it was possible that she had told the female caller that the log had been sent back and she was returning it, Rogers stated "That's possible, because as far as I can recall, she called me somewhere around the time that it got returned and me sending it back, yeah," (*id.* at 190-91).[7]

Defendants also contrast Rogers' inability to remember details about this case and her personal life (she misremembered the year she sent back the food log, and then could not remember if she had been considering a move to Atlanta) with her ability to recall the year and month Smith sent her the food log (April 2012).  Defendants also pointed out that Rogers did not recall the color of the ink on the food log she claims to have possessed.  (11/28/20 Tr., dkt. 208, at 172.)

I agree that Rogers' ability to recall details of her interactions with Smith was limited; indeed, she acknowledged difficulty recalling certain details relevant to her interactions with

---

[6]  Defendants also question why Smith was unable to contact Rogers directly, since she testified that she had a landline and an account with SCI that would have permitted Smith to call her.  However, Rogers' testimony during the hearing about Smith's ability to call her during the summer of 2019 was unclear. (11/28/20 Tr., dkt. 208, at 184.)  Rogers also testified that it was common for third parties to reach out to her on behalf of an inmate.

[7]  It appears that Rogers' mailing was sent back to her, and she testified that she believed it was because she did not include Smith's inmate number.  Defendants had previously argued that Smith was lying about the package being returned to Rogers, but they appear to have backed off this theory.

Smith.  That is not necessarily a sufficient reason to discredit a witness's testimony: it is understandable that Rogers might have difficulty recalling some of the details of events that happened in 2019.   Nonetheless, I have not credited Rogers' testimony.  First (but least importantly), Rogers had a motive to back up Smith's version of events: she was a family member and Smith had promised her part of his winnings from the lawsuit back in 2018. (11/28/20 Tr., dkt. 208, at 130.) Second, as noted, Rogers's recollection of the relevant events was spotty and in places her testimony was inconsistent with Smith's testimony in inexplicable ways.  Third, and most saliently, Smith's communications Natalie Johnson, discussed above, show that *she* was helping him create the food log between May and June of 2019.

## II.  Dismissal is the Appropriate Sanction

"Dismissal pursuant to the court's inherent authority can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false." *Ramirez*, 845 F.3d at 776, quoting *Secrease*, 800 F.3d at 4001.  That being so, courts must consider other sanctions before resorting to dismissal.  *Rivera v. Drake,* 767 F.3d 685, 786 (7th Cir. 2014); *see also Donelson v. Hardy*, 931 F.3d 565, 569 (7th Cir. 2019) ("[S]anctions, including dismissal, must be proportionate to the circumstances.  Considerations relevant to proportionality include the extent of the misconduct, the ineffectiveness of lesser sanctions, the harm from the misconduct, and the weakness of the case.").

Here, Smith didn't just know that the food log was false, he fabricated it himself, he enlisted others to assist him with his fraud on the court, and he repeatedly and brazenly lied about his misconduct–including in his sworn testimony–in order to keep these two lawsuits

afloat.  Dismissal of both cases seems eminently reasonable in light of the egregiousness of Smith's misbehavior.

A monetary sanction would be pointless.  Smith is indigent, proceeding *in forma pauperis* in these lawsuits.  Imposing a sanction of costs or fees would have any specific or general deterrent effect.  *Secrease*, 800 F.3d at 402 ("[T]he threat of a monetary sanction would probably not influence" the behavior of a litigant proceeding *in forma pauperis*.) (citing *Rivera*, 77 F.3d at 687).

Excluding Smith's fabricated evidence merely would return matters to the pre-fraud status quo.  That's more akin to an adverse evidentiary ruling than a sanction.  It doesn't come close to capturing the depth and breadth of Smith's misconduct.  In any event, Smith doesn't even intend to rely on the food log in Case '796, so excluding this evidence from that case would accomplish nothing. On that same point, the fact that Smith does not intend to rely on the food log as evidence in that case does not militate toward a sanction less severe than dismissal: Smith's own testimony about the food log made it discoverable in that case.

Auguring dismissal are the extraordinary and unnecessary costs in time, energy and money incurred by everyone involved in Smith's cases, including a top-flight team of volunteer attorneys whose zealous efforts should not have been squandered on a client who was unwilling to uphold his  obligations as a litigant in this court.  *See Dupree v. Hardy*, 859 F.3d 458, 462 (7th Cir. 2017).  We all have spent almost two years on an evidentiary snipe hunt because of Smith. This not something the court takes lightly.

Segueing from this is the need for both specific and general deterrence.  All litigants, including pro se prisoner plaintiffs, must understand that if they fabricate evidence, or

intentionally and repeatedly mislead the court, or both, then they face almost certain dismissal, the sanction must proportional to their attempts to thwart the fair and efficient resolution of their lawsuit.

Accordingly, having found facts and having considered the totality of the circumstances, I conclude that dismissal of both of these lawsuits is a proportionate sanction for Smith's fabrication of the food log and related misrepresentations during discovery and before the court. I will not, however, designate these dismissals as strikes pursuant to 28 U.S.C. § 1915(g). This statute limits the circumstances in which a prisoner, who on three or more occasions, while incarcerated or detained, brought an action that was dismissed as frivolous, malicious, or for failure to state a claim, from proceeding *in forma pauperis*. There is no language in the statute suggesting that a dismissal as a sanction for misconduct counts as a "strike," defendants cite no authority allowing me to designate this dismissal as a strike, and I do not conclude that these lawsuits were frivolous or maliciously filed. *See Hoskins v. Dart*, 633 F.3d 541 (7th Cir. 2011) (dismissals as a sanction for disobeying a court rule were not "strikes," since they were not dismissals for failure to state a claim, or because the lawsuits were frivolous or malicious).

Finally, the court thanks Smith's volunteer counsel from Perkins Coie for their tireless, zealous advocacy on behalf of their client. They did everything they possibly could for Smith, for which I commend them. There is nothing else they could have done that would have changed the outcome.

ORDER

IT IS ORDERED that:

1)   Defendants' motion to admit evidence (dkt. 114) is GRANTED in part and
     DENIED in part, as provided above.

2)   Defendants' motions to dismiss ('796 Case, dkt. 163; '189 Case, dkt. 67) are
     GRANTED, and these lawsuits are DISMISSED with prejudice.

3)   The clerk of court is directed to enter judgment in defendants' favor in both cases
     and close them.

Entered this 20th day of April, 2021

                                        BY THE COURT:

                                        /s/
                                        _____
                                        STEPHEN L. CROCKER
                                        Magistrate Judge